## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| _____ | ) | |
| RUSSELLVILLE LEGENDS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 23-1061 |
| | ) | |
| v. | ) | Filed: July 24, 2024 |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### OPINION AND ORDER

The Government, through the United States Army Corps of Engineers ("Corps"), purchased a flowage easement over a tract of land in Russellville, Arkansas, in 1964. Several decades later, the Corps executed a consent agreement with the then-owner, Joe Phillips, permitting him to add up to 7,000 cubic yards of fill to the property in the easement area. Plaintiff Russellville Legends, LLC purchased the property in 2018 from Mr. Phillips and subsequently requested permission from the Corps to add fill to the property and construct housing. The Corps denied Plaintiff's request on the basis that the project would jeopardize public safety, interfere with Corps projects, and violate the terms of the flowage easement, which prohibits the construction of structures for human habitation. Plaintiff challenged the Corps' denial in the United States District Court for the Eastern District of Arkansas. The District Court held for the Government, and the United States Court of Appeals for the Eighth Circuit affirmed the decision. *See Russellville Legends, LLC v. United States Army Corps of Engineers* (*Russellville I*), No. 4:19-CV-00524-BSM, 2021 WL 1230399 (E.D. Ark. Mar. 31, 2021); *Russellville Legends, LLC v. United States Army Corps of Engineer*s (*Russellville II*), 24 F.4th 1192 (8th Cir. 2022).

After selling the property at a loss, Plaintiff filed this action alleging a Fifth Amendment

taking without just compensation.  *See* Pl.'s Compl., ECF No. 1.  The Government has moved to dismiss the Complaint on the grounds that Plaintiff has failed to state a claim.  For the reasons discussed below, the Court **GRANTS** the Government's Motion.

## I. BACKGROUND

### A.   Flowage Easement and Consent Agreement

The relevant property ("Property") is located between two floodways in Russellville: Prairie Creek and Engineer Ditch.  *Id.* at 14.  These two floodways drain into a sump for the Russellville Dike and Prairie Creek Pumping Station, both of which are maintained by the Corps. *Id.*  The sump is used to collect and hold water, which eventually flows to the pumping station and is pumped away from the city.  *Id.*  Part of the Property lies within the sump area, upstream from the Russellville Dike and Prairie Creek Pumping Station.  *Id.*

In 1964, the Corps acquired a flowage easement ("Flowage Easement") over the Property for $5,000.  *Id.* ¶ 6; Def.'s Mot. to Dismiss, Ex. A, ECF No. 6-1 (Flowage Easement).  The easement deed conveys "unto the said UNITED STATES OF AMERICA and unto its assigns, the perpetual right, power, privilege and easement occasionally to overflow, flood and submerge the land hereinafter described."  ECF No. 6-1 at 2.  The easement area is identified as the portion of the Property "lying below the 334 contour and containing 20.00 acres, more or less."  *Id.*  The easement deed additionally provides that "no structures for human habitation shall be constructed or maintained on the land" and that "any structures . . . thereto now existing or to be erected or constructed on the land" may only be built with approval from the Corps.  *Id.*

As explained by the District Court in the prior litigation, "[i]n 1993, the City of Russellville requested permission from the Corps to remove dirt from the part of [the] [P]roperty that was within the flowage easement, to use as fill for a street project."  *Russellville I*, 2021 WL 1230399,

at *1.  With the Corps' permission, "7,000 cubic yards of dirt were taken from the northernmost ten acres of [the] property."  *Id.*  Three years later, in 1996, the Corps entered into a consent agreement ("Consent Agreement") with Mr. Phillips.  ECF No. 1 ¶ 7; Def.'s Mot. to Dismiss, Ex. B, ECF No. 6-2 (Consent Agreement).  In the agreement, the Government "[gave] consent for placement of fill material, not to exceed 7000 cubic yards," on the Property within a specified portion of the Flowage Easement.  ECF No. 6-2 at 2; *see id.* at 4 (map showing area of property where fill is permitted).  The Consent Agreement provides that the Corps' giving of consent "does not in any way subordinate the United States['] prior easement rights."  *Id.* at 2.  The agreement further provides that the "consent does not eliminate the necessity for obtaining any Department of Army permit" required by law, including under the Rivers and Harbors Act of 1899 and the Clean Water Act.  *Id.* at 3.

## B.    Permit Denial

Plaintiff purchased the Property from Mr. Phillips in February 2018, allegedly for the purpose of constructing student housing for Arkansas Tech University.  ECF No. 1 ¶ 5; *see* Def.'s Mot. to Dismiss, Ex. C, ECF No. 6-3 (Purchase Deed).  As a part of the project, Plaintiff intended to place the remainder of the 7,000 cubic yards of fill on the Property, which allegedly "would elevate virtually all of the Property above the elevation of the flowage easement."  ECF No. 1 ¶ 7. In April 2018, after obtaining all necessary permits from the City of Russellville, Plaintiff began initial work on the Property to construct the housing project.  *Id.* ¶ 8.  On July 31, 2018, the Corps sent a letter to Plaintiff, pursuant to its authority under Section 403 of the Rivers and Harbors Act, explaining that the Flowage Easement prohibits human habitation in the easement area and that Plaintiff must obtain authority from the Corps.  *Id.* ¶ 9; *see id.* at 12.  After further discussions, the Corps advised Plaintiff that a permit was necessary under Section 408 of the Clean Water Act for

Plaintiff to build the project.  ECF No. 1 ¶ 10.  Section 408 prohibits persons from "in any manner whatever impair[ing] the usefulness" of works controlled by the United States in order to prevent flooding.  33 U.S.C. § 408(a).[1]

Notably, the Corps' July 31 letter indicated that the Consent Agreement was "still in effect" and "authorizes the placement of 7000 cubic yards of fill material[,]" but it did "not authorize the construction of structures in the flowage easement."  ECF No. 1 at 12.  As summarized by the District Court, the Corps sent Plaintiff another letter in September 2018, explaining that "[c]onsent was granted solely to Phillips, does not run with the land, and that Russellville does not have authority to place fill dirt onto the easement."  *Russellville I*, 2021 WL 1230399, at *1.

Plaintiff then formally requested permission from the Corps pursuant to Section 408 to add fill and build housing on the Property.  ECF No. 1 ¶ 11.  Plaintiff's initial request included a

---

[1] Subsection 408(a) prohibits numerous other activities.  33 U.S.C. § 408(a).  In addition, it allows the United States Army to give certain kinds of permissions related to its works.  *Id.*  The subsection provides in full:

> It shall not be lawful for any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work under the control of the United States, in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, tide gauges, surveying stations, buoys, or other established marks, nor remove for ballast or other purposes any stone or other material composing such works: *Provided*, That the Secretary of the Army may, on the recommendation of the Chief of Engineers, grant permission for the temporary occupation or use of any of the aforementioned public works when in his judgment such occupation or use will not be injurious to the public interest: *Provided further*, That the Secretary may, on the recommendation of the Chief of Engineers, grant permission for the alteration or permanent occupation or use of any of the aforementioned public works when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work.

*Id.*

"volume displacement calculation" performed by an environmental consulting firm, which concluded that Plaintiff's proposal "would not have a statistically significant impact on water elevation and velocity in the flowage easement." *Russellville I*, 2021 WL 1230399, at *1. The Corps objected to the volume displacement calculation methodology, so the environmental consultant revised its calculations using a hydraulic model and forwarded its updated analysis to the agency. *Id.*; *Russellville II*, 24 F.4th at 1196. The Eighth Circuit noted that, based on its review of the record, "the consultant did not include an interpretation of the significance or effect of the updated data it provided." *Russellville II*, 24 F.4th at 1196. In the Complaint, Plaintiff alleges that its environmental consultant's analysis demonstrated that the "Project would not be located within nor have an impact on the Corps' remaining flowage easement or on the Clean Water Act Section 408 project that the Corps had recently initiated for improvement of the nearby Prairie Creek channel." ECF No. 1 ¶ 11.

The Corps assessed the proposal with the revised methodology and denied Plaintiff's request on April 3, 2019. *Id.* ¶ 12; *see id.* at 13. The denial letter explained that Plaintiff's proposal "may impair the usefulness of two [Corps] projects and that it may be injurious to the public interest." *Id.* at 13. The letter further explained that "as shown in data provided by [Plaintiff's] agent, the proposed alterations may reduce the sump capacity, which would increase flood heights in downtown Russellville, and may increase channel velocities." *Id.* Based on that data, the Corps determined that the velocities and water depth create "a significant hazard that can deny escape" in the event of a 100-year flood. *Id.* For that reason, the Corps concluded that the proposal could "threaten the lives and security of the people and property in Russellville in contradiction to the purpose of the two [Corps] projects." *Id.*

Plaintiff requested reconsideration, and the Corps upheld its denial on July 2, 2019. *Id.* ¶

13; *see id.* at 14–15.  In reaching its decision, the Corps relied on three factors: "(1) impacts to the usefulness of the Russellville Dike/Prairie Creek Pumping Station and the Prairie Creek Section 205 project,[2] (2) public safety, and (3) policy non-compliance."  *Id.* at 14.  With respect to Corps projects, the Corps elaborated that, based on the information provided, the proposed project would negatively impact a "FEMA 100-year floodplain" and "create a significant obstruction to the natural flow of floodwater into the sump area."  *Id.*  In addition, the proposed project "would also increase channel velocity and water surface elevations in the Prairie Creek Section 205 project area."  *Id.*; *see Russellville II*, 24 F.4th at 1197 (explaining that Plaintiff's environmental analysis "shows that the channel velocity at one point along Prairie Creek would increase from 3.09 feet per second to 5.3 feet per second if the housing project were constructed" and that "the water levels, in the event of a 100-year flood, would rise above the first floor of several buildings and over the parking lots and exits").  On the point of public safety, the Corps made the following findings:

> The proposed project would increase flood risks to people and property.  The higher channel velocities and water surface elevations mentioned above would increase existing flood risks in the City of Russellville.  Additionally, constructing student housing within the 100-year floodplain introduces new flood hazards within the City of Russellville, posing life safety risks to occupants of the housing units, as well as damage to real property and personal property (e.g. automobiles in parking lots).

ECF No. 1 at 14–15.  Finally, the Corps concluded that approving the project would be inconsistent with Corps legal and policy requirements based on the Flowage Easement's prohibition of habitable structures and Executive Order 11,988, which requires federal agencies "to avoid to the extent possible the long and short term adverse impacts associated with the occupancy and

---

[2] The then-ongoing Prairie Creek Section 205 project was designed to store runoff from the Prairie Creek watershed.  *Russellville I*, 2021 WL 1230399, at *3.

modification of floodplains and to avoid direct or indirect support of floodplain development wherever there is a practicable alternative." *Id.* at 15; Exec. Order No. 11,988, 42 Fed. Reg. 26,951 (May 24, 1977). The Corps additionally explained that Plaintiff's proposal "did not adequately address alternatives to building within the floodplain." ECF No. 1 at 15. In the event that Plaintiff intended to submit a new Section 408 request, the Corps provided Plaintiff a copy of the relevant criteria and restrictions it used in its evaluation. *Id.*

C.     **Prior Litigation**

After the Corps denied its request, Plaintiff filed suit in the District Court seeking review under the Administrative Procedure Act. *See Russellville I*, 2021 WL 1230399, at *1. The court entered summary judgment in favor of the Government. It first held that the Consent Agreement was not a contract, and therefore denied Plaintiff's request for declaratory relief in the form of a declaration that Plaintiff had rights under the Consent Agreement. *Id.* at *2. In addition, the court held that, regardless of whether the Consent Agreement was in effect, Plaintiff was required to seek approval from the Corps for the proposed project. *Id.* The court further held that the Corps' decision to deny the proposal was rational and supported by the record. *Id.* at *3–4. As the court explained, the Corps considered the relevant data submitted by Plaintiff and was not, itself, required to conduct its own scientific analysis. *Id.* at *3. The court also held that the Corps reasonably concluded that the proposal would increase flood risks and jeopardize public safety and, in a similar vein, that the "proposal would impair the usefulness of other Corps projects." *Id.* at *4. Further, the court held that the Corps reasonably concluded, after examining the scientific models submitted by Plaintiff, that "the Prairie Creek cross sections go through the proposed apartment complex at three locations," and that the "project would obstruct the natural flow of floodwater into the sump area, which is an 'integral' part of the Corps' Russellville Dike and

Prairie Creek Pumping Station project." *Id.*

On appeal, the Eighth Circuit affirmed the District Court's decision. *Russellville II*, 24 F.4th at 1197. The Circuit did not determine the effect of the Consent Agreement on the Flowage Easement as it agreed, in all events, that the Corps lawfully denied Plaintiff's request. *Id.* at 1195. The Circuit explained that "the [consent] agreement isn't a basis for avoiding the need to obtain permission under [Section] 408(a) in every circumstance because it explicitly states that it does not absolve the landowner of the responsibility to obtain necessary permits." *Id.* Even if the project were completely outside of the scope of the Flowage Easement, the Circuit held that Plaintiff was still required to obtain permission under Section 408 because such projects "could undoubtedly impair the usefulness of a Corps project from outside its boundaries." *Id.* Moreover, it found the project proposal was subject to Section 408(a) because it "would span Prairie Creek and thus be within the geographic boundaries of a different Corps project involving Prairie Creek." *Id.* at 1196. Ultimately, the Circuit affirmed the District Court's holding that the Corps' denial was rational and supported by the record. *Id.* at 1196–97.

On July 12, 2022, six months after the Eighth Circuit's decision, Plaintiff filed a lawsuit in the Court of Federal Claims. *See* Pl.'s Compl., *Russellville Legends, LLC v. United States*, No. 1:22-cv-00756-KCD (Fed. Cl. July 12, 2022), ECF No. 1. Plaintiff alleged that the permit denial amounted to a per se taking and, in the alternative, that it had been a partial taking. *Id.* ¶¶ 13–24. Plaintiff, however, voluntarily dismissed the lawsuit. Notice of Voluntary Dismissal, *Russellville Legends, LLC v. United States*, No. 1:22-cv-00756-KCD (Fed. Cl. Sept. 29, 2022), ECF No. 7.

### D.    The Instant Action

After it sold the Property, Plaintiff filed the Complaint in the instant case. ECF No. 1 ¶ 27. In its newly filed Complaint, Plaintiff alleges that the Corps effected a partial taking by denying

Plaintiff's permit. *Id.* ¶¶ 17–30. According to Plaintiff, when the Corps executed the Consent Agreement, it authorized Mr. Phillips to place fill in a specific area of the Property, which would elevate almost all the Property above the 334' line. *Id.* ¶ 18. Plaintiff argues that the Government therefore released its rights under the Flowage Easement in that portion of the Property. *Id.* ¶ 19. As such, Plaintiff alleges that the Corps' denial of Plaintiff's request to add fill on the Property and build housing constitutes a regulatory taking under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), entitling Plaintiff to just compensation. *Id.* ¶ 24.

The Government moved to dismiss Plaintiff's Complaint for failure to state a claim under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). *See* Def.'s Mot. to Dismiss, ECF No. 6. Plaintiff filed its Response on December 22, 2023. *See* Pl.'s Resp., ECF No. 8. The Government filed its Reply on January 12, 2024. *See* Def.'s Reply, ECF No. 9. The Motion is therefore ripe for decision.

## II.   LEGAL STANDARDS

In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must plausibly state a claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* RCFC 12(b)(6). Though courts must "accept as true all of the allegations contained in a complaint," that principle is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Accordingly, courts use a "two-pronged approach[,]" first "identifying [allegations] that, because they are no more than conclusions, are not entitled to the assumption of truth," and then, "assum[ing] the veracity" of "well-pleaded factual allegations," "determin[ing] whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

When assessing whether the well-pleaded factual allegations plausibly state a claim for relief, courts may consider the complaint itself, exhibits attached to the pleading, "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (quoting 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d. ed. 2004)); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). "Exhibits attached to a complaint are considered part of the complaint for the purposes of a motion to dismiss, and the Court 'must consider the complaint in its entirety, . . . in particular, documents incorporated into the complaint by reference' in ruling on a motion to dismiss." *Irwin Cnty. v. United States*, 170 Fed. Cl. 355, 361 (2024) (alteration in original) (quoting *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016)); *see also* RCFC 10(c).

### III. DISCUSSION

The Fifth Amendment proscribes the taking of private property "for public use, without just compensation." U.S. CONST. Amend. V, cl. 4. A "taking" may occur either by physical invasion or by a regulation that goes too far. *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014–19 (1992); *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1371 (Fed. Cir. 2004); *Maritrans Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003). This case concerns an alleged partial regulatory taking.

The Government has moved to dismiss Plaintiff's Complaint on the grounds that Plaintiff has failed to state a claim. The Government argues that Plaintiff had no property interest in adding

fill and constructing housing on the Property, and therefore it cannot state a takings claim.  ECF No. 6 at 14–19; ECF No. 9 at 4–6.  The Government further argues that, even if Plaintiff had a property interest in executing its project, Plaintiff has not plausibly alleged a taking under *Penn Central*.  ECF No. 6 at 19–26; ECF No. 9 at 6–11.

### A.    Plaintiff Has Not Plausibly Alleged a Cognizable Fifth Amendment Property Interest Taken By the Government.

In deciding whether to dismiss a takings clam for failure to state a claim, the Court must first determine "whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Acceptance Ins. Companies, Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009); *see also Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995) ("In analyzing a takings claim, a court must first determine what was taken."). Here, Plaintiff alleges that its property interest was taken when the Corps denied Plaintiff's permit application to add fill to and build housing on the Property.  ECF No. 1 ¶ 21.  The Government argues, and the Court agrees, that Plaintiff had no property interest in executing this project.

### 1.    Plaintiff Lacks a Property Interest in Executing its Project Because the Flowage Easement Imposes a Pre-Existing Limitation on the Property.

It is well settled that "'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002) (quoting *Lucas*, 505 U.S. at 1030).  In determining the scope of property interests compensable under the Fifth Amendment, these rules "often involve and define 'the citizen's relation to the physical thing, as the right to possess, use and dispose of it.'" *Id.* (quoting *United States v. Gen. Motors*, 323 U.S. 373, 378 (1945)).  Limitations on property rights that "inhere in the title itself" are permissible.  *Bair v. United* States, 515 F.3d 1323, 1327

(Fed. Cir. 2008) (quoting *Lucas*, 505 U.S. at 1029).  Where the Government "asserts a 'pre-existing limitation upon the landowner's title,'" it has not effected a taking.  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021) (quoting *Lucas*, 505 U.S. at 1028–29).

In this case, the documents properly before the Court show that the Government asserted a pre-existing limitation on Plaintiff's title.  Under the Flowage Easement in effect when Plaintiff bought the Property, the Government holds the "perpetual right" to "overflow, flood and submerge the land" within the easement.[3]  ECF No. 6-1 at 2.  Further, "structures for human habitation" are prohibited in the easement, and approval from the Corps for the construction of any other "structures and/or appurtenances" is required.  *Id.*; *see Russellville I*, 2021 WL 1230399, at *1 (recounting the undisputed fact that "[t]he easement deed provided that no structures for human habitation may be constructed on the easement, due to flooding risks").  Plaintiff therefore did not possess a cognizable property interest in freely constructing housing on the Property.

---

[3] For purposes of this opinion, the Court has considered documents attached to the Complaint, including the Corps' denial and reconsideration letters.  *See Rocky Mountain Helium*, 841 F.3d at 1325–26; *see also* RCFC 10(c).  It has also considered documents attached to the Government's Motion, including the Flowage Easement, Consent Agreement, and Purchase Deed, each of which is a public record and is integral to Plaintiff's claim.  *See Kalos v. United States*, 87 Fed. Cl. 230, 241 (2009), *aff'd*, 368 F. App'x 127 (Fed. Cir. 2010); *Bristol Bay Area Health Corp. v. United States*, 110 Fed. Cl. 251, 262 (2013); *Dimare Fresh*, 808 F.3d at 1306; *see also* ECF No. 1 ¶¶ 6, 7, 15, 18, 19 (allegations containing references to the documents).  Plaintiff does not dispute that the Court may consider the latter documents without converting the motion to one for summary judgment, nor does it dispute the authenticity of any of the three documents.  *See* 5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366 (3d ed. 2023) (explaining that courts may consider attachments to the complaint, public records, matters of which the court can take judicial notice, and "items of unquestioned authenticity that are referred to in the challenged pleading and are 'central' or 'integral' to" the plaintiff's claim without converting to summary judgment).

  2. <u>The Corps Did Not Release the Flowage Easement When It Executed the Consent Agreement.</u>

  Plaintiff argues that the Corps previously released its rights under the Flowage Easement by executing the Consent Agreement, and that the rights provided in the agreement passed to Plaintiff when it purchased the Property. ECF No. 8 ¶ 17. Following Plaintiff's logic, if the Corps released its easement rights, then the Flowage Easement would not impose a pre-existing limitation on Plaintiff's use of the Property. This argument fails. Plaintiff has not plausibly alleged facts to support the conclusion that the Government conveyed its easement rights under Arkansas law back to the then-owner, Mr. Phillips.

  Under Arkansas law, an express easement may be terminated only by expiration, agreement, abandonment, prescription, or merger. *Sluyter v. Hale Fireworks P'ship*, 262 S.W.3d 154, 157, 159 (Ark. 2007). Further, "[a] document releasing an easement must meet the requirements of one creating an easement." *Patterson v. Buffalo Nat'l River*, 76 F.3d 221, 225 (8th Cir. 1996). Such documents must have "effective words expressing the fact of transfer or grant." *White v. Zini*, 838 S.W.2d 370, 372 (Ark. Ct. App. 1992) (giving "grant, bargain, or sell" and "release, relinquish and quitclaim" as examples of words of conveyance). The Arkansas Supreme Court has clarified that while "formal words are not required, a deed must contain sufficient words to convey the interest." *Davis v. Griffin*, 770 S.W.2d 137, 138 (Ark. 1989). Though words of conveyance can appear anywhere in the instrument, the words must refer to the conveyance of the relevant property interest. *See Johnson v. Ramsay*, 67 S.W.3d 598, 601–02 (Ark. Ct. App. 2002) (holding that a document's explanatory clauses providing that "free and uninterrupted use of said easement is hereby granted" and describing the parties as "grantors" was sufficient). In addition to requiring words of conveyance, Arkansas "law requires courts to give effect to the parties' intent, if possible, when construing an instrument." *Davis*, 770 S.W.2d at

138.  However, even if "it is clear from the four corners of the instrument that the granting of an easement was intended," that instrument cannot convey easement rights unless the instrument contains words of conveyance or transfer.  *White*, 838 S.W.2d at 372–73.

Here, Plaintiff has not plausibly alleged that the Government released its easement rights by executing the Consent Agreement because the agreement does not contain words of transfer, a fact that the Complaint does not (and cannot) dispute.  ECF No. 6-2 at 2–3; *see White*, 838 S.W.2d at 372–73.  At most, the Consent Agreement states that the Government "gives consent to Joe W. Phillips for the placement of fill material."  ECF No. 6-2 at 2.  Assuming that "gives" would qualify as a word of conveyance under Arkansas law, "gives" only refers to "consent," and does not refer to easement rights.  *Cf. Johnson*, 67 S.W.3d at 601–02.  Indeed, the only mention of the Corps' easement rights in the Consent Agreement clarifies that the Corps was not conveying its easement rights.  ECF No. 6-2 at 2 ("The giving of this consent does not in any way subordinate the United States['] prior easement rights.").

Though the lack of words of conveyance is sufficient to establish that the Corps did not release its easement rights, *see White*, 282 S.W.2d at 373, Plaintiff has also failed to allege facts to show that the parties intended for the Government to release its rights under the Flowage Easement.  *See Davis*, 770 S.W.2d at 138.  Instead, it argues that the release was done by implication: because the Corps authorized Mr. Phillips to place fill in the easement, allegedly raising the land above the 334' line, the Corps necessarily released its rights under the easement.  ECF No. 8 ¶ 17.  That alleged implication, however, is belied by the plain language of the Consent Agreement, which provides that "the giving of this consent does not in any way subordinate the United States['] prior easement rights."  ECF No. 6-2 at 2.  The Consent Agreement could not have been more clear that the parties did not intend for the Government to release its rights under

14

the Flowage Easement.  *See id.*

For additional support on the point of intent, the Government cites to the Corps' policies explaining that consent agreements do not transfer any interest in real estate.  U.S. Army Corps of Eng'rs, EC No. 1165-2-220: Policy and Procedural Guidance for Processing Requests to Alter U.S. Army Corps of Eng'rs Civil Works Projects Pursuant to 33 U.S.C. § 408, at 2 (2018) ("Corps Policy Guidance") (explaining that "Outgrants" convey property interests, while "Consents" do not, and that "Consents" do not interfere with an easement holder's rights).  Plaintiff responds that these policies are relevant to arbitrary and capricious review, but "do not establish the applicable law for this case."  ECF No. 8 ¶ 19.  This response mistakes the Government's point.  The Government is not arguing that the policies define Plaintiff's property rights.  Rather, the Corps Policy Guidance provides support for the Government's position that the parties did not intend for the Consent Agreement to release the Corps' easement.  *See* ECF No. 6 at 17–18.  In any event, under Arkansas law, courts need not go beyond the four corners of a document where, as here, the document is unambiguous with respect to the parties' intent.  *Gibson v. Pickett*, 512 S.W.2d 532, 535 (Ark. 1974) ("The intention of the parties must be gathered from the four corners of the instrument itself, if that can be done, and when so done, it will control."); *see, e.g.*, *Davis*, 770 S.W.2d at 139 (ascertaining the intent of the parties from the written instrument).  Because the plain language of the Consent Agreement is clear that the parties did not intend for the Government to release its easement rights by executing the agreement, the Court need not consider the Corps Policy Guidance in holding for the Government on this point.

Accordingly, regardless of the Consent Agreement, the Flowage Easement operates as a pre-existing limitation on the use of the Property.

3.      Plaintiff Has No Rights Under the Consent Agreement Because the Agreement
        Does Not Run With the Land.

Plaintiff additionally argues that Mr. Phillips' right to add fill to the Property under the

Consent Agreement was transferred to Plaintiff when Plaintiff acquired the Property.  ECF No. 8

¶ 19.  To that end, Plaintiff posits that "nothing in the Consent Agreement" provides "that the

rights, privileges, and obligations conferred by the Corps were limited solely and personally only

to the prior owner, and not transferrable to a subsequent purchaser."  *Id.* (citing ECF No. 6-2).  The

Government responds that the Corps granted consent to Mr. Phillips personally, and therefore the

Consent Agreement does not run with the land.  ECF No. 9 at 25–26.

To support its position, Plaintiff primarily relies on a provision of state law entitled "Fee

simple estate—Presumption."  ECF No. 8 ¶ 18 (citing Ark. Code Ann. § 18-12-105 (West 2024)).

That provision of law, however, only applies to fee simple estates, and not to other kinds of

property interests.  *See Roemhild v. Jones*, 239 F.2d 492, 496 (8th Cir. 1957).  As explained by the

Arkansas Supreme Court, the statute displaces the common law rule that words of inheritance were

required for a deed to convey a complete estate of inheritance in fee simple.  *McDill v. Meyer*, 128

S.W. 364, 365 (1910) ("At common law a fee could not by deed be granted without words of

inheritance; but by force of our statute (Kirby's Dig. § 733) 'all deeds shall be construed to convey

a complete estate of inheritance in fee simple, unless expressly limited by appropriate words in

such deed.'").  The applicability of the statutory provision to Plaintiff's position is far from

apparent.  Plaintiff does not allege or argue that the Corps had a fee simple ownership interest in

any portion of the Property, nor that such an interest was conveyed to Mr. Phillips (and then

Plaintiff) through the Consent Agreement.  *See* ECF No. 8 ¶¶ 16, 18–19.

Though the consent given to Mr. Phillips lacks a perfect analog in Arkansas state property

law, many cases address whether a document conveys an interest in property use that runs with

the land.  These cases, often involving covenants or easements, require courts to give effect to the

intent of the parties—namely the intent of the grantor.  *Riffle v. Worthen*, 939 S.W.2d 294, 297

(1997) (explaining that whether an easement runs with the land depends on interpretation of the

deed, and that courts must "give primary consideration to the intent of the grantor") (citing *Wilson*

*v. Brown*, 897 S.W.2d 546 (1995)); *Winningham v. Harris*, 981 S.W.2d 540, 542 (Ark. Ct. App.

1998) (citing *Gibson*, 512 S.W.2d at 532).  Thus, the central question is whether the grantor—the

Corps—intended for the consent to be personal to the grantee—Mr. Phillips.

 Plaintiff has not alleged any facts supporting the conclusion that the Corps intended for the

consent to be anything other than personal.[4]  The Consent Agreement identifies Mr. Phillips in

giving him consent, stating that "the United States hereby gives consent to *Joe W. Phillips* for the

placement of fill material."  ECF No. 6-2 at 2 (emphasis added).  This phrasing indicates that

consent was personal to Mr. Phillips because he was specifically identified as the recipient of the

consent.  *See Rose Lawn Cemetery Ass'n v. Scott*, 317 S.W.2d 265, 267 (1958) (holding that use

of a roadway did not run with the land because the deed creating the interest provided that the

roadway was reserved "for use of the parties hereto"); *Winningham*, 981 S.W.2d at 242–43.

 The Government argues that words of inheritance would be required for the Consent

Agreement to run with the land.  ECF No. 6 at 1; ECF No. 9 at 5–6.  Several cases support the

---

 [4] In its Response, Plaintiff alleges that it "met with the Corps before and after the land purchase, and the Corps confirmed that the Consent Agreement was still effective."  ECF No. 8 ¶ 10.  Plaintiff acknowledges, as it must, that those allegations are not included in the Complaint. *Id.*; *see Davis v. United States*, 108 Fed. Cl. 331, 338 n.4 (2012), *aff'd*, 550 F. App'x 864 (Fed. Cir. 2013) ("As judges of this court have noted: [I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (internal quotation marks omitted)).  Regardless, even if the Consent Agreement were still in effect, the agreement by its plain terms did not release the Corps' rights under the Flowage Easement and did not absolve Plaintiff of the requirement to obtain any Corps permit required by law in connection with Plaintiff's use of the Property.  ECF No. 6-2 at 2, 3; *see also Russellville II*, 24 F.4th at 1195–96.

Government's position, holding that Arkansas law requires words of inheritance for a property interest conveyed (other than fee simple) to run with the land. *See Bernard Ct., LLC v. Walmart, Inc.*, No. CV-19-536, 2020 WL 7251256, at *12 (Ark. Dec. 9, 2020); *Nordin v. May*, 188 F.2d 411, 414 (8th Cir. 1951) (citing *Fort Smith Gas Co. v. Gean*, 55 S.W.2d 63, 65–66 (1932)). Even assuming that such words are not required, they are still relevant to whether the grantor intended for the interest granted to run with the land. *See, e.g.*, *Murphy v. Kerr*, 5 F.2d 908, 910 (8th Cir. 1925) (holding that words of inheritance were sufficient to show the grantor's intent that a property interest run with the land).

Here, the lack of words of inheritance in the Consent Agreement indicates that the Corps did not intend for the consent to run with the land. *Cf. id.* The absence of words of inheritance is all the more conspicuous due to their inclusion in both the Flowage Easement and Purchase Deed. *See Riffle*, 939 S.W.2d at 475–76; *Winningham*, 981 S.W.2d at 245; *compare* ECF No. 6-1 at 2 (conveying the Flowage Easement "unto the said UNITED STATES OF AMERICA and *unto its assigns*" and reserving other rights "to the owner of the lands, *his heirs and assigns*" (emphasis added)) *and* ECF No. 6-3 at 2 (conveying the Property to "Grantee [Russellville Legends, LLC], *and unto its successors and assigns forever*"), *with* ECF No. 6-2 at 2 (giving consent "to Joe W. Phillips"). Accordingly, Plaintiff has failed to plausibly allege that the consent given to Mr. Phillips was not intended to be personal to Mr. Phillips and therefore runs with the land.

**B.      Plaintiff Has Failed to State a Claim for a Regulatory Taking.**

Even if Plaintiff had a cognizable property interest, the Government argues that the Complaint nonetheless fails to allege sufficient facts to state a claim for a regulatory taking under the *Penn Central* factors. ECF No. 6 at 13–20; ECF No. 9 at 6–10. The Court agrees.

The *Penn Central* factors are as follows: (1) "the character of the governmental action,"

(2) "the extent to which the [action] interfered with distinct investment-backed expectations," and (3) "[t]he economic impact of the regulation on the [plaintiff]." *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1151 (Fed. Cir. 2014) (quoting *Penn Central*, 438 U.S. at 124). If Plaintiff fails to allege facts to support its claim under these three factors, Plaintiff is unable to "succeed as a matter of law." *Taylor v. United States*, 959 F.3d 1081, 1090 (Fed. Cir. 2020); *see McCutchen v. United States*, 145 Fed. Cl. 42, 55–56 (2019) (holding that plaintiffs failed to state a regulatory takings claim because the allegations were "insufficient to establish a regulatory taking upon consideration of" factors one and two).

### 1.   Nature of the Government Action

Under the first *Penn Central* factor, the inquiry focuses on the "precise action that the government has taken and the strength of the governmental interest in taking that action." *Cienega Gardens v. United States*, 503 F.3d 1266, 1279 (Fed. Cir. 2007). As explained by the Federal Circuit:

> The character of the governmental action factor requires a court to consider the purpose and importance of the public interest underlying a regulatory imposition, by obligating the court to "inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented.

*Maritrans*, 342 F.3d at 1356 (quoting *Creppel v. United States*, 41 F.3d 627, 631 (Fed. Cir. 1994)). Where the government acts to protect public health and safety, a regulatory taking is less likely to be found. *See Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1351 (Fed. Cir. 2004); *Rith Energy, Inc. v. United States* (*Rith Energy III*), 270 F.3d 1347, 1352 (Fed. Cir. 2001); *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1281 (Fed. Cir. 2009).

In *Appolo Fuels*, the Federal Circuit held that the denial of a mining permit was not "the type of governmental action that has typically been regarded as . . . requiring compensation for the

burdens it imposes on private parties who are affected by the regulations."  381 F.3d at 1351 (quoting *Rith Energy III*, 270 F.3d at 1352).  The Circuit reached that conclusion because granting the permit would have negatively impacted the domestic water supply.  *Id.  Rith Energy III* similarly held that the Government's revocation of a mining permit was not in the nature of a taking because it was "directed at protecting the safety, health, and welfare of the communities surrounding the Rith mine site by preventing harmful runoff."  270 F.3d at 1352.

In the instant case, Plaintiff's permit was denied in order to protect the health and safety of the Russellville community.  As Plaintiff's Complaint acknowledges, "[t]he Easement is for the purpose of drainage in the event of overflow of Lake Dardanelle or flooding from heavy rains." ECF No. 1 ¶ 6 n.3.  In the Corps' letter explaining its decision to deny Plaintiff's request to add fill to the easement area and construct housing, the Corps noted that Plaintiff's "proposed project would increase flood risks to people and property" in Russellville.  *Id.* at 13.  Specifically, the Corps' letter explained that the occupants of the proposed housing, if constructed, would face risks to their lives.  *Id.*  In considering these safety concerns, as well as impacts to the utility of Corps projects in the surrounding area, the restrictions of the Flowage Easement, and policy requirements, the Corps decided to deny Plaintiff's request.  *Id.* at 14–15.  Because the allegations indicate that the proposed project was denied to protect the safety of the public from catastrophic flood events, the nature of the Government's action weighs strongly against finding a regulatory taking.

Beyond a conclusory statement that its claim meets the *Penn Central* standard, Plaintiff does not directly contest that the Government's action was not in the nature of a taking.  *See* ECF No. 1 ¶ 26; ECF No. 8 ¶¶ 20–22 (addressing the second and third factors).  Instead, Plaintiff argues that just because the permit denial was upheld by the District Court under the arbitrary and

capricious standard, this Court should not take for granted the Corps' conclusion that the development would have "negative effects on [the Corps'] projects or the public."  ECF No. 8 ¶ 13.  The Court need not "defer" to the Corps' findings and conclusions, nor "resolve the factual inquiry inherent in the *Penn Central* ad hoc analysis."  *Id.* ¶ 15.  Rather, the Court appropriately considers the Corps' denial letters attached to Plaintiff's Complaint.  *See supra* at 10, 12 n.3.  The letters establish that the Corps denied Plaintiff's request to protect the community from catastrophic flooding risks.  Plaintiff therefore cannot show that the Government's action was in the nature of a taking.

Further, the Federal Circuit has expressly rejected the argument that a plaintiff may relitigate its challenge to an administrative action in a takings claim case before this Court.  *Rith Energy v. United States* (*Rith Energy II*), 247 F.3d 1355, 1365 (Fed. Cir. 2001) (holding that the Court of Federal Claims may not entertain a collateral challenge to the validity of the action giving rise to the alleged taking (quoting *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed. Cir. 1995))).  In that case, the plaintiff challenged a mining permit suspension, as well as an administrative appeal decision upholding the action.  *Id.*; *Rith Energy v. United States* (*Rith Energy I*), 44 Fed. Cl. 108, 112 (1999).  The claims were ultimately dismissed, and the district court subsequently transferred the case to this Court to resolve the plaintiff's claim for compensation for the alleged taking.  The Federal Circuit held that, assuming the lawfulness of the agency's decision, the court was bound to accept that the agency "was correct in concluding that Rith's mining activities constituted an unacceptable threat of acid mine drainage and the consequent pollution of groundwater in the area surrounding the mine operations."  *Rith Energy II*, 247 F.3d at 1366 .  That reasoning applies with even greater force where, as here, the District Court and Eighth Circuit both found that the Corps' decision was lawful rational and supported by the record.  *See supra* § I.1.C.

The Court therefore appropriately assesses the character of the Corps' denial by examining its findings and conclusions. *See Rith Energy II*, 247 F.3d at 1366; *see, e.g.*, *Appolo Fuels*, 381 F.3d at 1350–51 (assessing the character of the Government's action by reviewing the agency decision).

### 2.   Investment-Backed Expectations

The second *Penn Central* factor requires a plaintiff to show that the Government interfered with its reasonable investment-backed expectations. *See Good v. United States*, 189 F.3d 1355, 1360 (Fed. Cir. 1999)). "A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)). In analyzing whether a plaintiff has met this factor, the Federal Circuit has advised that courts may consider "whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property" and "whether the plaintiff could have 'reasonably anticipated' the possibility of such regulation in light of the 'regulatory environment' at the time of purchase." *Appolo Fuels*, 381 F.3d at 1349 (quoting *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001)).

Based on Plaintiff's allegations, the second *Penn Central* factor weighs strongly against the finding of a regulatory taking. Plaintiff alleges that it bought the Property with the expectation that it would be able to construct housing on the Property and in reliance upon the Consent Agreement. ECF No. 1 ¶¶ 19, 23. Taking these allegations as true, Plaintiff's reliance on the agreement reached between the Corps and Mr. Phillips was not reasonable. The Consent Agreement explicitly reserves the United States' prior easement rights and reaffirms the need to obtain permits from the Corps. ECF No. 6-2 at 2–3. When Plaintiff purchased the Property, moreover, the Purchase Deed referenced the Flowage Easement (not the Consent Agreement) and

reiterated the Government's "perpetual right, power, privilege and easement to occasionally overflow, flood, and submerge the land . . . as may be required in connection with the operation of" Corps projects.  ECF No. 6-3 at 6.  Plaintiff could not have reasonably relied on a belief that the Corps lacked the authority to disapprove the construction of Plaintiff's housing project, which would partially be built on the portion of the Property subject to the Flowage Easement.

Further, even assuming the Government had released its easement rights and that Plaintiff had its own rights under the Consent Agreement, Plaintiff could not have reasonably expected that the Corps would not "alter[], impair[] or take[]" Plaintiff's property rights given Section 408(a). *See* ECF No. 1 ¶ 18.  In some cases, a statute can provide sufficient notice so as to render any investment-backed expectations unreasonable.  For example, in *Appolo Fuels*, a mining company alleged a regulatory taking after the Government designated lands it leased as being unsuitable for mining.  381 F.3d at 1343.  The mining company was aware when it purchased the property of a statute authorizing the Government to designate its land as unsuitable.  *Id.* at 1349–50.  The Federal Circuit held that "[t]he statute gave notice sufficient to defeat [the mining company's] reasonable expectations by providing for a process by which [the Government] could designate lands as unsuitable for mining under a broad array of circumstances."  *Id.* at 1350.

Section 408 similarly provided Plaintiff with sufficient notice that the Corps could limit Plaintiff's use of the Property.  Section 408 requires Plaintiff to seek approval before building a project like this one, regardless of the content or effect of the Consent Agreement.  *Russellville II*, 24 F.4th at 1195.  As explained by the Eighth Circuit in *Russellville II*, the statute broadly prohibits "impairing" Corps projects "in any manner whatever[.]"  *Id.* (quoting 33 U.S.C. § 408(a)).  Given Plaintiff's awareness of the requirements of the statute—as expressly reiterated in the Consent Agreement—Plaintiff could not have reasonably expected to execute the project without the

Corps' approval.  *See* ECF No. 6-3 at 4–5.  That fact alone is fatal to any allegation as to Plaintiff's

reasonable investment-backed expectations.  *See Appolo Fuels*, 381 F.3d at 1350.

       3.    <u>Economic Impact</u>

      The third factor, the economic impact of the alleged regulatory taking, focuses on whether

the subject property "suffered a diminution in value or a deprivation of economically beneficial

use."  *A & D Auto Sales*, 748 F.3d at 1157.  Plaintiff alleges that the Property was valued at

$700,000 prior to the Corps' denial and was sold for $300,000 after the denial.  ECF No. 1 ¶¶ 27–

28.  As such, Plaintiff alleges a $385,000 loss in market value.  *Id.* ¶ 16.  Taking Plaintiff's

allegations as true, the Property decreased 55 percent in value as a result of the permit denial.  *Id.*

      This factor weighs neither for nor against Plaintiff.  Plaintiff argues, and the Court agrees,

that assessing the *Penn Central* factors cannot be reduced to a "simple mathematical test."  ECF

No. 8 ¶ 21.  The Government similarly acknowledges that "the Federal Circuit has disavowed any

strict numerical threshold."  ECF No. 6 at 21 (citing *Cienega Gardens*, 331 F.3d at 1340).  Though

there is no strict cutoff where a plaintiff alleges a diminution of value, 55 percent appears to be on

the low end of the spectrum.  *See Arctic King Fisheries, Inc. v. United States*, 59 Fed. Cl. 360, 385

n.53 (2004) (collecting cases finding no taking where diminution ranged between 25 and 60

percent).  Similarly, the Federal Circuit has also remarked that it is "aware of no case in which a

court has found a taking where diminution of value was less than 50 percent."  *CCA Assocs. v.

United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011).

      In its Response, Plaintiff advances additional theories of economic loss.  *See* ECF No. 8 ¶

22.  Plaintiff argues that the permit denial resulted in "Plaintiff's complete loss of its opportunity

to conduct the business for which it was created," and that Plaintiff is now "no longer in business."

*Id.*  The Government objects to these arguments, asserting that Plaintiff "cannot amend the

Complaint through its response." ECF No. 9 at 7 (citing *Davis v. United States*, 108 Fed. Cl. 331, 337 n.4 (2012)). Though Plaintiff's claim for relief appears to allege only the loss in market value as the relevant economic loss for the purpose of its regulatory takings claim, ECF No. 1 ¶ 29, the facts relevant to Plaintiff's newly articulated theory of loss are arguably included in the Complaint. *Id.* ¶¶ 15, 23. While the Complaint does not mention that Plaintiff went out of business,[5] Plaintiff alleges that the permit denial "prohibit[ed] the economically beneficial and productive use" of the Property, and "thereby destroy[ed] all of the owner's reasonable, investment-backed expectations[.]" *Id.* ¶ 15. Plaintiff further alleges that the denial "rendered the [P]roperty useless to the Plaintiff for its intended purposes of student housing[.]" *Id.* ¶ 23; *see id.* ¶ 3 (alleging that Plaintiff's "principal business was . . . to construct a privately-owned student housing project on land owned by Russellville Legends adjacent to Arkansas Tech University").

Taking these allegations as true, and therefore assuming that the permit denial caused damage to Plaintiff's intended business of constructing housing on the Property, these losses do not establish economic loss under the Fifth Amendment. When the Government effects a taking that impacts a plaintiff's business, "[t]he settled rules of law" preclude the recovery of "consequential damages for losses to their business, or for its destruction," as these are not compensable under the Takings Clause. *Mitchell v. United States*, 267 U.S. 341, 345 (1925); *Taylor*, 959 F.3d at 1088 n.3 ("The Takings Clause's focus on particular property interests is reflected in the longstanding rule that the clause does not provide for compensation for 'consequential losses.'" (quoting *General Motors*, 323 U.S. at 379–80)).

---

[5] In its Response, Plaintiff states that it "is no longer in business" and cites to its Complaint at paragraph 16. ECF No. 8 ¶ 22. Paragraph 16 alleges that Plaintiff sold the Property and provides details about the value of the property but does not assert that Plaintiff went out of business. *See* ECF No. 1 ¶ 16.

\*    \*    \*

In short, considering the documents properly before the Court and assuming the truth of Plaintiff's factual allegations, no *Penn Central* factor weighs in Plaintiff's favor.  Plaintiff's allegations do not contest the fact that the permit denial was not in the nature of a taking, nor does Plaintiff plausibly allege that its investment-backed expectations were reasonable.  Though Plaintiff alleges some diminution in the Property's value, even a large diminution in value—which this is not—would not suffice to state a claim because the alleged economic loss cannot overcome the first two factors.  *McCutchen*, 145 Fed. Cl. at 56–57; *see also Appolo Fuels*, 381 F.3d at 1348–52 (holding that the Government's action was not a partial regulatory taking, even accepting as true that the action reduced the value of the plaintiff's property interests by 78 percent and 92 percent, where the first and second factors weighed in the Government's favor).  Accordingly, Plaintiff has failed to state a claim under *Penn Central* upon which relief can be granted.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Government's Motion to Dismiss (ECF No. 6) for failure to state a claim.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**


Dated: July 24, 2024                                      */s/ Kathryn C. Davis*
                                                                        KATHRYN C. DAVIS
                                                                        Judge